**Ella M. OUTLAW, Appellant–Plaintiff,**

v.

**ERBRICH PRODUCTS COMPANY, INC., Appellee–Defendant.**

No. 93A02–0202–EX–139.

Court of Appeals of Indiana.

Oct. 21, 2002.

Marcia J. Cossell, Lee, Burns & Cossell, Indianapolis, IN, Attorney for Appellant.

Bruce Alvarado, Ofranos & Alvarado, Indianapolis, IN, Attorney for Appellee.

## OPINION

BAILEY, Judge.

### Case Summary

This is Ella M. Outlaw's third appeal of the denial of her application for worker's compensation benefits. In each of her first two appeals, this Court reversed the Worker's Compensation Board ("the Board")'s denial of her application and remanded with instructions to enter more particular findings supporting its decision. *See Outlaw v. Erbrich Products Co.*, 742 N.E.2d 526 (Ind.Ct.App.2001) ("*Outlaw I*"); *Outlaw v. Erbrich Products Co.*, 758 N.E.2d 65 (Ind.Ct.App.2001) ("*Outlaw II*"). For the reasons set forth below, we now affirm the Board's decision.

### Issue

The issue is whether the Board properly denied Outlaw's application for worker's compensation benefits.

### Facts and Procedural History

As we recounted in her previous two appeals, Outlaw started working for Erbrich Products Company ("Erbrich") in the early 1980s. Outlaw worked on assembly lines producing and bottling products ranging from mustard and vinegar to bleach and toilet bowl cleaner. Outlaw mainly worked on the line producing toilet bowl cleaner. At some point, Outlaw began to experience severe respiratory problems. She sought medical treatment in 1991, and her physician recommended a change of employment, believing that Outlaw's condition was related to her exposure to chemicals at work. Outlaw eventually quit. She filed her Application for Adjustment of Claim for worker's compensation benefits on May 6, 1992.

On December 16, 1992, Dr. Kane L. Schaphorst, one of Outlaw's physicians, wrote to Outlaw's attorney and explained that Outlaw suffered from occupationally-related reactive airways disease following a spill of toilet bowl cleaner at work. (R. 204.) Dr. Schaphorst explained that he performed a test in which samples of Erbrich's toilet bowl cleaner were aerosolized in a room in which Outlaw was sitting, and that exposure to the aerosolized toilet bowl cleaner caused significant bronchiospasm and a measurable decline in her pulmonary functioning. (R. 204.)[1] Dr. Schaphorst referred Outlaw to Dr. Joe G.N. Garcia for further evaluation and treatment.

Dr. Garcia examined Outlaw on January 5, 1993, and issued a report of his examination on January 8. In his report, Dr. Garcia explained that Outlaw complained of various respiratory symptoms, including wheezing, coughing, and shortness of breath. Outlaw told Dr. Garcia that she worked with toilet bowl cleaner that contained ammonia, hydrochloric acid, sodium hypochlorite, acetic acid, formaldehyde and fabric softener.[2] According to Dr. Garcia, Outlaw explained that her symptoms increased following exposure to fumes from the toilet bowl cleaner in March 1991.

---

1. The record before us consists of Outlaw's Appendix, a three-volume Record of Proceedings (the case was first appealed while our old Appellate Rules were in force), and two volumes of what is denominated as Transcript of Documentary Evidence, and which evidently consists of documents stipulated to by the parties prior to the Board's hearing. Citations to these sources will be identified accordingly.

2. As will be noted below, these do not appear to have been the actual ingredients of the toilet bowl cleaner.

Outlaw stated that she had smoked one to two cigarettes per day for almost twenty years, but that she had quit smoking in 1992. Dr. Garcia diagnosed Outlaw with bronchiolitis, which Dr. Garcia attributed to a combination of cigarette smoking and chemical exposure at work. (Tr. 265.) Dr. Garcia continued to treat Outlaw's condition, describing it variously as bronchiolitis, occupational asthma, obstructive lung disease with a bronchospastic component and features of emphysema, hyperreactive airways disease, and severe small airways disease with large airway involvement. On June 22, 1993, he wrote to Outlaw's attorney, explaining that Outlaw suffered from obstructive lung disease with a bronchospastic component and features of emphysema, and again relating the condition to Outlaw's exposure to chemicals in the workplace. Dr. Garcia also assessed Outlaw a permanent partial impairment rating of 40%. (Tr. 231.)

On January 22, 1994, Dr. William J. Waddell issued a report to Erbrich regarding his analysis of Outlaw's medical records. Dr. Waddell addressed Outlaw's history of cigarette smoking, and explained that while Outlaw claimed to have stopped smoking prior to the onset of her respiratory problems, tests taken on December 17, 1992 and February 25, 1993 revealed levels of carboxyhemoglobin consistent with the consumption of two to three packs of cigarettes per day. (R. 114.) Dr. Waddell questioned the fact that Dr. Garcia's January 8, 1993 report noted the carboxyhemoglobin test results but failed to explain their significance as it related to Outlaw's history of cigarette smoking. Dr. Waddell also questioned Dr. Garcia's understanding of the contents of the toilet bowl cleaner that Dr. Garcia reported to be a contributing cause of Outlaw's symptoms, as well as Dr. Garcia's understanding of basic principles of chemistry in general. As noted above, Dr.

Garcia's January 8, 1993 report indicates that Outlaw told him that the toilet bowl cleaner she worked with contained ammonia, hydrochloric acid, sodium hypochlorite, acetic acid, formaldehyde and fabric softener. Dr. Waddell, however, explained that the toilet bowl cleaner could not have contained ammonia or formaldehyde, and that if it had, the ammonia would have reacted with the hydrochloric acid to produce ammonium chloride, and the ammonia would have neutralized the formaldehyde. (R. 114–115.) Dr. Waddell concluded that there was simply no medical evidence to establish that Outlaw's exposure to the chemicals actually found in the toilet bowl cleaner, and most notably the hydrochloric acid, caused Outlaw's symptoms. Rather, according to Dr. Waddell, Outlaw's symptoms were the result of twenty years of heavy cigarette smoking.

On July 12, 1995, Dr. Garcia was deposed. Dr. Garcia testified that Outlaw had a history of smoking approximately two cigarettes per day, and admitted that while unlikely, cigarette smoking could have caused Outlaw's condition. (R. 149.) Dr. Garcia stated, however, that it was "more likely than not that her exposure to the harmful agents in the work place [was] the primary cause of her prominent lung dysfunction." (R. 132.) Dr. Garcia testified that the toilet bowl cleaner had been "identified as being the primary component in [Outlaw's] work exposure." (R. 128.) Dr. Garcia indicated, as he had in his January 8, 1993 report, that the toilet bowl cleaner consisted of hydrochloric acid, acetate, ammonia, sodium hypochlorate, acetic acid, formaldehyde and fabric softener. (R. 130.) He further stated that Outlaw told him she had been continuously exposed to these substances at work when toilet bowl cleaner would spill out of its dispensing machine. (R. 130.) Dr. Garcia

was asked about which of the various "harmful agents" to which Outlaw was exposed at work caused her condition as follows:

Q: Earlier we talked about the possible constituents or components of the products that Miss Outlaw helped to make or manufacture, and I'd like to follow up on that a little bit. If of all those things that we have identified as being possible things to which she was exposed, if we identified hydrochloric acid as the primary compound to which she was exposed, would hydrochloric acid alone be sufficient to cause this kind of condition that Miss Outlaw is suffering from?

A: *I believe that hydrochloric acid, repetitive exposure to significant concentration of that agent could produce by itself the abnormalities that we see in Miss Outlaw.* Again, I have to say that it's very difficult to pinpoint which agent in a combination of chemicals is capable of producing a particular syndrome when one or more of them may be injurious in and of themselves. For example, Miss Outlaw also produced and applied labels to these containers containing this, and in the process of labeling these containers, there are glues and adhesives on the back of the labels that contain asthmagine, that is chemicals capable of producing and inducing occupational asthma. So it's [a] kind of very complex question we're asking here. *I tend to gravitate towards the idea that as your question implies, that acid fumes such as hydrochloric acid are—likely played a very important role in her subsequent lung dysfunction.* And the reason I say that as opposed to a purse [sic] asthmatic type picture,

Miss Outlaw deviates from the pure asthmatic picture by having such profound alterations in her diffusion capacity and in her small airway capacity, and asthma generally there's primarily a large airway abnormality but the diffusion capacity remains perfectly well preserved. But in Miss Outlaw, she has significant declines in both her diffusion capacity and in her small airway capacity that *make me believe that this is something that is a syndrome which may include asthma, but also contains other components that must be explained by additional exposure such as acid fumes.*

(R. 141–142) (emphasis added.) Dr. Garcia went on to explain the significance of Outlaw's diminished diffusion capacity by stating that Outlaw was having trouble bringing air into the lower levels of her respiratory tract, and thus transporting oxygen to her bloodstream, as a result of chemically-induced injuries to the lower lung area. (R. 143.) Although Dr. Garcia speculated that other unidentified substances found in the toilet bowl cleaner might have been harmful, he did not specifically relate Outlaw's condition to any substance other than hydrochloric acid.

On April 2, 1996, Dr. Waddell issued a report responding to Dr. Garcia's deposition. According to Dr. Waddell, Dr. Garcia's explanation that Outlaw's respiratory disease was located in the lower portion of her respiratory tract seriously undermined Dr. Garcia's opinion that the disease was caused by the inhalation of hydrochloric acid from the toilet bowl cleaner. As Dr. Waddell saw it, inhaled hydrochloric acid would first cause significant burning of the eyes, ears, nose, throat and upper respiratory tract before affecting the lower areas. Because Outlaw had not complained of such serious injuries, Waddell ruled out

inhalation of hydrochloric acid as a cause of her condition. (R. 116.) Dr. Waddell further indicated that the hydrochloric acid in the toilet bowl cleaner was present in a concentration characterized by such low vapor pressure that a spill would not lead to the vaporization of the acid. According to Dr. Waddell, the only alternative plausible explanation for Outlaw's condition was cigarette smoking.

Dr. Garcia treated Outlaw periodically during the ensuing years. On March 4, 1997, he again wrote to Outlaw's attorney explaining Outlaw's condition and describing his treatment. Dr. Garcia explained that Outlaw's symptoms first arose in the late 1980s, and worsened in the early 1990s, as a result of workplace chemical exposures. Dr. Garcia again concluded that while Outlaw had a history of cigarette smoking, which Dr. Garcia described as "variable," Outlaw's symptoms were "more likely than not related to Ms. Outlaw's exposure to toxic chemicals in the work place." (Tr. 117.) Dr. Garcia revised Outlaw's permanent partial impairment rating to 50%, and explained that Outlaw would require medical treatment for the remainder of her life to maintain her then-current level of respiratory function. (Tr. 177–178.) Outlaw continued to receive treatment from Dr. Garcia until as late as 1998.[3]

Dr. Duane Houser, an asthma expert retained by Outlaw, was deposed on March 13, 1998. Dr. Houser had reviewed Outlaw's medical records, and stated that he generally supported Dr. Garcia's opinion. When asked whether inhalation of hydrochloric acid caused Outlaw's condition, however, Dr. Houser testified, "I don't think anyone knows." (R. 309.) He further testified that he didn't "see that it

could necessarily be the hydrochloric acid. For all we know it's the fabric softener in [the toilet bowl cleaner] that did it." (R. 330.) Dr. Houser stated, however, that

[w]e don't know that because no one has scientifically with her taken each of the ingredients and challenged her in a blinded fashion, along with controls, with a number of other asthmatics, to make sure that everyone doesn't react to it like the way the challenge was done. So I don't say its hydrochloric acid.

(R. 330.) Despite acknowledging the apparent absence of scientific evidence linking Outlaw's condition to any of the chemicals present in the toilet bowl cleaner, Dr. Houser was certain that exposure to the toilet bowl cleaner caused Outlaw's condition "[b]ecause she presented to Wishard [Hospital] after this spill, and she talks about that. And gets much worse after that." (R. 330.)

As for the potential role of other chemicals identified by Dr. Garcia as being present in the toilet bowl cleaner, Dr. Houser stated,

... I don't think anyone knows what this mixture, not just the hydrochloric acid. [sic] The MSD from the manufacturer only talks about hydrochloric acid. It does not talk about them all, and they're usually required to list each individual thing, what it does. But no one, I know of no one who studied this product and what would happen if you nebulized that, or had that spill, and so on, so forth.

(R. 310.) When Dr. Houser was presented with a list of different substances, which the parties evidently agreed were the actual ingredients of the toilet bowl cleaner,[4]

---

3. The most recent medical record from Dr. Garcia is dated January 15, 1998.

4. As noted above, Dr. Garcia's January 8, 1993 report indicates that Outlaw told him that the toilet bowl cleaner she worked with

Dr. Houser testified without explanation that one of the substances was a "sensitizing agent," and stated further that,

> even though you would say the most important ingredient in there is biggest, and the most active is the hydrochloric acid, I don't think you can exclude when that's all mixed up together that that acid in some way, it's doing something, or that mixture is not what really did this because no one's done that study. And I apologize that I did not. I took this from dictation, which is in there twice with the ingredients.

(R. 332–333.) Dr. Houser also alluded to the possibility that Outlaw might have been exposed to chemicals while placing labels on the bottles filled on the assembly lines, but stated that he had no opinion as to whether those chemicals might have caused her condition. (R. 337.) Finally, Dr. Houser doubted that cigarette smoking alone could have caused Outlaw's condition, because her symptoms were typically not present in a person who smoked forty packs of cigarettes per year, or approximately two cigarettes per day.[5] (R. 314.)

Dr. Waddell was deposed on April 20, 1998. He testified, as he had previously explained in his reports, that Outlaw's condition could not possibly have been caused by the inhalation of hydrochloric acid from the toilet bowl cleaner because the vapor pressure of the acid at the level of concentration found in the cleaner was nearly zero, and that it would not vaporize, or enter the air to be inhaled, even if the cleaner were spilled. (R. 58–61.) Dr. Waddell further explained that Outlaw had not otherwise sustained her lower-lung condition by exposure to hydrochloric acid because there was no evidence of the kind of burning of the eyes, nose and throat that would accompany such an injury. (R. 58–59.) Dr. Waddell also addressed the question of the true composition of the toilet bowl cleaner. He stated that in addition to the hydrochloric acid, the cleaner contained detergents, dye, and fragrance. (R. 50, 66.) When asked if the other ingredients in the toilet bowl cleaner could have caused Outlaw's condition, Dr. Waddell stated, "[n]o, not really." (R. 65.) Dr. Waddell instead concluded that Outlaw's

---

contained ammonia, hydrochloric acid, sodium hypochlorite, acetic acid, formaldehyde and fabric softener. The record indicates that Erbrich had previously provided Outlaw with a list of the actual ingredients of the toilet bowl cleaner in response to Outlaw's written discovery requests, and that the only substance listed by Dr. Garcia actually found in the toilet bowl cleaner was hydrochloric acid. (R. 331.) These ingredients, about which there appears to be no dispute, include substances identified as surfactant (whether this refers to an individual substance or describes one already named is unknown), TDET, methasalicylate, BTC, T15M and BC21. (R. 331–333.) There is no indication in the record that Dr. Garcia was ever provided with an accurate list of the true ingredients of the toilet bowl cleaner at issue, and there is no mention of them in his records or his deposition.

5. It appears that we inadvertently mischaracterized Dr. Houser's testimony regarding the level of Outlaw's smoking in *Outlaw I*, 742 N.E.2d 526. In that case, another panel of this court wrote that Dr. Houser testified "that even if Outlaw smoked two packs of cigarettes a day for twenty years, he would not expect to see such a high level of reactivity in her airways." *Id.* at 531. As noted above, Dr. Houser based his opinion on the assumption that Outlaw smoked 40 packs of cigarettes per year, or around two cigarettes per day. The difference would have been significant for the Board, as Dr. Waddell indicated that, at least at the time of her carboxyhemoglobin tests, Outlaw was smoking between two and three packs per day. Contrary to what we said in *Outlaw I*, however, Dr. Houser did not express an opinion as to whether Outlaw's condition could have resulted from the higher level of smoking.

condition must necessarily have resulted from years of heavy smoking.

A single hearing member of the Board heard Outlaw's case on May 19, 1999. The evidence recounted above was submitted on stipulation to the Board, and only Outlaw and a fellow employee actually testified during the hearing. Outlaw testified that when she was employed with Erbrich, she worked primarily on the toilet bowl cleaner line, and that there were frequently spills of the cleaner. (R. 369–372.) She also testified that she quit smoking in 1988. (R. 381.) The hearing member rejected Outlaw's application for benefits, and issued the following Findings of Fact and Conclusions of Law:

> 1. It is further found that based on the deposition of Dr. Garcia, Dr. Garcia was provided with an erroneous history by the plaintiff as the doctor indicates that the plaintiff was continuously exposed to chemicals involving ammonia, hydrochloric acid, sodium hypochlorite, acetic acid, formaldehyde, and fabric softener.
>
> 2. It is further found that such history is not true and that so called batches of toilet bowl cleaner did not include all of such chemicals and, in fact, if they did the mere combining of such chemicals would cause immediate adverse chemical reaction.
>
> 3. It is further found, therefore, that Dr. Garcia's conclusions are of less probative value based on the erroneous history provided to him.
>
> 4. It is further found that the toilet bowl cleaner in question contained a less than 10% concentration of hydrochloric

acid and that the other ingredients were basically detergents and perfume.

> 5. It is further found that at concentrations lower than 20% the vapor pressure of hydrochloric acid is so low that virtually none of the acid would exist in vapor form.
>
> 6. It is further found that the doctors describe plaintiff's disease in terms of her lower respiratory tract and that if hydrochloric acid were a causative agent one would expect that there would be demonstrable damage to plaintiff's upper respiratory tract, which the undersigned finds that there is no such damage evident.
>
> 7. It is further found that the plaintiff is a long-time cigarette smoker and that she has given different statements regarding the cessation of her smoking, the credibility of which must be questioned.
>
> 8. It is further found that based upon the evidence herein, the plaintiff has failed to demonstrate that she suffered from respiratory problems arising out of and in the course of her employment with the defendant herein.

(R. 7–8.) Outlaw sought review of the hearing member's decision before the full Board, which affirmed the decision and adopted the hearing member's findings and conclusions. (R. 12–22.) Outlaw appealed the Board's rejection of her application.

We took up her appeal in *Outlaw I*, 742 N.E.2d 526. In *Outlaw I*, another panel of this Court perceived some of the Board's findings to be unsupported by the evidence.[6] We also determined that the

---

6. For example, the other panel concluded that finding number one was unsupported by the evidence. As noted above, in finding number one the Board determined that Dr. Garcia's belief that Outlaw was continuously exposed to ammonia, hydrochloric acid, sodium hypo-chlorite, acetic acid, formaldehyde, and fabric softener, was based on erroneous information provided by Outlaw. We correctly noted that the evidence indicated that all of these substances were present at Erbrich, and that Outlaw worked on all of the different produc-

Board's findings of fact were not sufficiently specific to permit meaningful review. In particular, the other panel faulted the Board for failing to make findings about Outlaw's possible workplace exposure to chemicals other than hydrochloric acid, such as the ammonia, sodium hypochlorite, acetic acid and formaldehyde identified by Dr. Garcia. *Id.* at 530–31. The other panel accordingly instructed the Board to review the evidence relevant to Outlaw's exposure to other chemicals, and to make specific applicable findings. *Id.* at 531. The panel also criticized the Board for failing to sufficiently relate the significance of Outlaw's history of cigarette smoking to the Board's conclusion that Outlaw failed to prove that her respiratory condition was caused by chemical exposure, and instructed to the Board to make more particular findings. *Id.*

Upon remand, the Board on June 5, 2001 issued the following additional findings:

A.) That the plaintiff worked primarily on the toilet bowl cleaner line.

B.) It is further found that the plaintiff also worked on the mustard line.

C.) It is further found that the evidence of plaintiff's work on the other lines did not include evidence of quantitative exposure to other chemicals as opposed to working on an area of the line where boxes were made or other operations.

D.) It is further found that evidence of qualitative exposure to a given chemical is not sufficient probative evidence to indicate a quantitative exposure sufficient to cause a given effect on the body.

E.) It is further found that Dr. Houser based his testimony in part on the bowl cleaner containing ammonia and other chemicals as evidenced by his testimony at deposition page 36.

F.) It is further found that the plaintiff had chronic bronchitis which pre-existed her claim herein.

tion lines at the facility. Finding number two, however, explained that Outlaw's history was erroneous because the toilet bowl cleaner did not contain what she evidently told Garcia it contained. We recognized in *Outlaw I* that finding number two was supported by the evidence. 742 N.E.2d at 530. When finding number one is read in conjunction with finding number two, it appears that the Board found Outlaw's information to be erroneous not because the substances were not present at Erbrich, but on the basis of the evidence that the composition of the toilet bowl cleaner to which Outlaw was exposed could not have been what she told Dr. Garcia it was. When the Board's finding number one is viewed in this light, it appears to be supported by the evidence.

The Board went on to state in finding three that Dr. Garcia's misunderstanding of the contents of the toilet bowl cleaner rendered his opinion regarding the cause of Outlaw's condition less probative. We stated in *Outlaw I* that this finding did not support the denial of Outlaw's claim because it had no impact on the probative value of Dr. Garcia's opinion

that Outlaw's exposure to chemicals at work caused her respiratory condition. Outlaw appears to take our disagreement with the Board's conclusion as a directive for the Board to accept Dr. Garcia's testimony. This was not what we meant. Our disagreement with the Board's conclusion that Dr. Garcia's testimony was not probative on the basis of the fact that he misunderstood the composition of the toilet bowl cleaner should be understood in its proper perspective. While Dr. Garcia spoke in general terms about a relationship between Outlaw's condition and her exposure to chemicals at work, the only chemical present at Erbrich that Dr. Garcia related to Outlaw's condition, was the hydrochloric acid found in the toilet bowl cleaner. Further, although his opinion that her exposure to that substance was no doubt "probative" of the cause of her injury in the sense that his testimony tended to prove Outlaw's claim, we noted in *Outlaw I* that the Board was free to reject Dr. Garcia's testimony. *See id.* at 530. We did not state, and did not intent to suggest in *Outlaw I* that the Board was required to accept Dr. Garcia's testimony on remand.

G.) It is further found that plaintiff continued to smoke as evidenced by her elevated carboxyhemoglobin levels in 1993.

H.) It is further found that plaintiff's condition did not improve when she was no longer exposed to the work environment by virtue of her having left her employment.

I.) It is further found that plaintiff's pulmonary and other lab studies are consistent with heavy cigarette smoking as the causative factor in her present condition and the undersigned finds the same to be true.

J.) It is further found that based upon the evidence herein, the plaintiff has failed to demonstrate that she suffered from respiratory problems arising out of and in the course of her employment with the defendant herein.

*Outlaw II*, 758 N.E.2d at 67–68. Outlaw again appealed, arguing that the Board's additional findings remained insufficient. A second panel of this court addressed the question in *Outlaw II*, which was handed down on November 14, 2001. That panel agreed that the Board's second round of findings were inadequate because they failed to "clarify what chemicals Outlaw was actually exposed to, whether Outlaw might have had a greater degree of susceptibility to those chemicals, and why the amount of the given exposures would not have an effect on Outlaw's medical condition." *Id.* at 68. This Court recognized that the Board's additional findings clarified the significance of Outlaw's history of smoking as it related to her medical condition, and we asked the Board to enter similarly specific findings "concerning the relevant issues of fact such as the chemicals Outlaw was actually exposed to, Outlaw's degree of susceptibility to those chemicals, and the possibility that the cumulative effect of exposure to the chemicals in the factory could create occupational asthma." *Id.* at 69. We instructed that "[i]f the Board finds that chemical exposure is inconsistent with Outlaw's condition, it should clearly state that finding and present the facts that support that determination." *Id.* at 68. On November 26, 2001, Outlaw filed a Motion for Change of Judge. The motion does not appear to have been ruled upon.

On January 18, 2002, the Board issued further additional findings in support of its denial of Outlaw's claims. They read as follows:

I.) That in order to meet the burden of proof plaintiffs must demonstrate that they were exposed to chemicals in sufficient concentration for sufficient time to cause a specific effect on the body.

II.) It is further found that all employees are exposed to various chemicals both in the course of their employment and in ordinary life.

III). It is further found that vinegar contains acetic acid at low concentrations. It is no more probative to say that the plaintiff was exposed to acetic acid rather than that she was exposed to vinegar unless the concentration of the chemical compounds and the length of exposure are also proven.

IV.) It is further found that the fact that a given chemical would create an odor or even temporary irritation is not sufficient evidence to prove exposure to a chemical compound in sufficient concentrations and for a sufficient period of time to cause a medical condition in the plaintiff.

V.) It is further found that whether exposure to a given chemical is sufficient to cause a given medical condition must be based on evidence of the chemical or chemical compound involved, the concentration, and the period of time a person was exposed.

VI.) It is further found that if the plaintiff seeks to prove that she had a greater susceptibility to those chemicals it would be the plaintiff's burden to prove that a given concentration of the chemical or chemical compounds produced a physiological reaction in the plaintiff and that such reaction was the cause of plaintiff's current medical condition. Such evidence could be in the nature of controlled "dose-response" testing where a given dose produced a physiological response in plaintiff.

VII.) It is further found that even assuming that plaintiff was "exposed" to each of the chemicals or chemical compounds she claims exposure to, this is not sufficient to sustain her burden of proof under the law.

VIII.) It is further found that although the possibility exists that the cumulative effect of exposure to the chemicals in the factory could create occupational asthma it is the plaintiff's burden to prove by a reasonable degree of medical certainty such exposure. The plaintiff failed in that burden of proof.

XI.) It is further found that the plaintiff's present physical condition is causally connected to her cigarette smoking and not the alleged exposures at the place of employment.

(App.9–10.) Outlaw again appeals the Board's decision.

## Discussion and Decision

### A. Worker's Compensation Claims, Board Decisions, and Appellate Review

#### 1. Worker's Compensation Benefits and a Plaintiff's Burden of Proof

 The Indiana Worker's Compensation Act requires employers to provide their employees with "compensation for personal injury or death by accident arising out of and in the course of the employment...." IND.CODE § 22–3–2–2. As we noted in *Outlaw I*, an accident occurs in the course of employment when it happens within the period of employment, at a place where the employee may reasonably be, and while the employee is fulfilling the duties of employment. 742 N.E.2d at 530 (citing *Tanglewood Trace v. Long*, 715 N.E.2d 410, 413 (Ind.Ct.App.1999), *trans. denied*). Erbrich does not dispute that a medical condition caused by chemical exposure at work is an accidental injury sustained in the course of employment. The primary issue before the Board was whether Outlaw's condition arose out of her employment. An injury arises out of employment when there is a causal relationship between the employment and the injury. *Muncie Indiana Transit Authority v. Smith*, 743 N.E.2d 1214, 1216 (Ind.Ct.App.2001). A causal relationship exists when the injury would not have occurred in the absence of the accident. *See Daub v. Daub*, 629 N.E.2d 873, 877 (Ind.Ct.App. 1994) (noting that in a negligence action, a causal connection exists when the harm would not have occurred "but for" the defendant's conduct). The party seeking benefits bears the burden to prove that his or her injury arose out of and in the course of employment. *Conway ex rel. Conway v. School City of East Chicago*, 734 N.E.2d 594, 598 (Ind.Ct.App.2000), *trans. denied*. Ultimately, the issue of whether an employee's injury arose out of and in the course of his employment is a question of fact to be determined by the Board. *Id.* at 597.

#### 2. Decisions of the Worker's Compensation Board

 Because both a claimant and an employer have a legal right to know the evidentiary basis for the Board's decision, the Board generally must enter specific

findings of basic fact that support its finding of ultimate fact and its legal conclusion when it renders a decision. *Perez v. U.S. Steel Corp.,* 426 N.E.2d 29, 32 (Ind.1981) (*"Perez I"*), *appeal after remand,* 428 N.E.2d 212 (Ind.1981) (*"Perez II"*). In *Perez I,* our Supreme Court explained that the "finding of ultimate fact" is the "ultimate factual conclusion regarding the particular claim before the Board...." *Id.* at 33. The Board may present its finding of ultimate fact in legal terms and definitions that fit the particular case. *Id.* Specific findings of basic fact, on the other hand, should relate to the Board's determination of the various sub-issues and factual disputes that must be resolved to determine the ultimate factual question before the Board. *Id.* The Board's findings must be sufficiently specific to give the reader an understanding of the Board's reasons, and the supporting evidence, for the ultimate finding of fact. *Id.*

▬▬▬ When the Board renders a negative judgment adverse to the claimant, however, "[t]he Board's decision need only be supported by findings related to the issue of proof, not to the factual question" presented by the particular case. *Hill v. Worldmark Corporation/Mid America Extrusions Corp.,* 651 N.E.2d 785, 786 (Ind. 1995). The Board is not obligated to make findings demonstrating that a plaintiff is not entitled to benefits; rather, the Board need only determine that the plaintiff has failed to prove entitlement to the benefits. *Id.*

### 3. Appellate Review

▬▬▬ In *Perez II,* our Supreme Court explained that because a claimant bears the burden of proof at hearing, the unsuccessful claimant who seeks to challenge the denial of his application appeals from a negative judgment. 428 N.E.2d

212, 216. When reviewing a negative judgment issued by the Board,

> we will not weigh the evidence nor judge the credibility of witnesses. Rather, we examine the record only to determine whether there is any substantial evidence and reasonable inferences which can be drawn therefrom to support the Board's findings and conclusion. Only if the evidence is of a character that reasonable [people] would be compelled to reach a conclusion contrary to the decision of the Board will it be overturned.

*Id.* "Unless the evidence is 'undisputed and leads inescapably' to a result contrary to the Board's finding, it will be affirmed." *Hill,* 651 N.E.2d at 787 (quoting *Rensing v. Indiana State Univ. Bd. of Trustees,* 444 N.E.2d 1170, 1172 (Ind.1983)).

### B. Analysis

#### 1. The Board's Findings

As in *Outlaw I* and *Outlaw II,* we are called upon to determine whether the Board properly denied Outlaw's claim for benefits. Outlaw argues that the Board once again failed to enter sufficiently specific findings. In particular, Outlaw cites our instruction in *Outlaw II* that the Board find facts supporting its conclusion that chemical exposure was inconsistent with Outlaw's condition. Outlaw contends that the Board erroneously failed to make findings specifically demonstrating how Outlaw's condition was not caused by chemical exposure at work as she claimed. We disagree.

▬▬▬ Outlaw's claim that the Board was required to make findings specifically demonstrating that her condition was not caused by chemical exposure at work and therefore did not arise out of her employment represents a misunderstanding of the Board's proper role in rendering and supporting a negative judgment adverse to

the claimant. The Indiana Supreme Court's decision in *Hill, supra,* is instructive here. In *Hill,* the plaintiff sought worker's compensation benefits related to an alleged disability resulting from a back injury. *Id.* at 785. The Board denied the plaintiff's claim, finding that he had " 'failed to prove an entitlement to disability or statutory medical' " benefits. *Id.* at 786. The plaintiff appealed, and in an unpublished memorandum decision, this Court remanded with instructions to make specific findings of fact regarding the plaintiff's ability to obtain reasonable types of employment in light of his back injury. *Id.* The Board issued additional findings supporting its denial, and the case came to us again. Believing that the primary question facing the Board was whether the plaintiff was disabled, this Court reversed the Board for insufficient findings as follows:

> The evidence of record in this case does not support a finding that Hill is capable of engaging in reasonable forms of work activity, a necessary predicate in determining whether or not Hill is disabled. Because the conclusion that Hill is not permanently totally disabled is unsupported by the Findings, the Board's decision must be reversed.

*Id.* (quoting *Hill v. Worldmark Corp./Mid America Extrusions Corp.,* 632 N.E.2d 1173, 1178 (Ind.Ct.App.1994)). The Indiana Supreme Court disagreed with our decision in *Hill,* which admittedly bears some procedural similarity to the case at hand, stating that we "misperceive[d] the nature and character of the Board's role in deciding this case." *Id.* As the Supreme Court explained,

> [h]ad the Board made an affirmative finding of permanent total disability, such a conclusion would have needed to be properly supported by findings. Here, on the other hand, the Board's

conclusion was a negative one—that Hill had failed to prove his claim of permanent total disability. The Board's decision need only be supported by findings related to the issue of proof, not to the factual question of Hill's disability. That is, for the Board to find against Hill, it need only determine that Hill had failed to prove that he was disabled; the Board need not determine that Hill was in fact not disabled.

*Id.* The court went on to note that the Board found that the plaintiff's treating physician had released him to return to work, that the plaintiff's disability claim was not supported by the opinion of a vocational expert, that the plaintiff's medical evidence of disability was not worthy of credit, that the plaintiff was able to return to work and that the plaintiff had failed to prove his entitlement to benefits. According to our Supreme Court, these findings were sufficient to support the Board's denial of the plaintiff's claim. *Id.* at 787.

*Hill* plainly stands for the proposition that while the Board is always obligated to enter findings that provide the reader and the reviewing court with an understanding of the Board's reasons for its decision, when the Board delivers a negative judgment adverse to the claimant, who bears the burden of proof, the Board does not need to make specific findings of fact disproving a plaintiff's claim for entitlement to benefits. Rather, the Board need only determine that the plaintiff has failed to prove entitlement to the benefits. Thus, the Board in the present case was not required to make specific factual findings negating or disproving Outlaw's entitlement to benefits. In particular, the Board was not required to find facts establishing that Outlaw's condition was not caused by chemical exposure at work or fixing the actual cause of Outlaw's condition. Upon concluding that Outlaw was not entitled to benefits, the Board was only obligated to

find that Outlaw had failed to meet her burden of proof and to enter findings explaining the reasons for this determination with sufficient particularity.[7]

As in *Hill*, the findings entered by the Board in this case fulfilled this obligation. In its first round of findings, the Board concluded that Dr. Garcia's theory that Outlaw's condition resulted from the inhalation of hydrochloric acid fumes was not worthy of credit because the hydrochloric acid found in the toilet bowl cleaner would not have been vaporized for inhalation due to its low vapor pressure, and that even if it had, Outlaw had not sustained the upper respiratory tract burns that would have accompanied such an injury. In its second round of findings, the Board noted that there was no evidence regarding the quantity of other chemicals to which Outlaw might have been exposed, and in its third round of findings stated that a plaintiff would have to introduce evidence of exposure to a particular chemical in sufficient concentrations and for a specific period of time in order to establish a causal relationship between exposure and a medical condition. In each round of findings, the Board expressly determined that Outlaw had failed to prove that her condition was caused by the exposure to chemicals at work. Rather, the Board stated in its second round of findings that the medical evidence was consistent with heavy smoking as the cause of her condition, and the Board specifically found in its third round of findings that Outlaw's condition was in fact caused by cigarette smoking. The Board's findings clearly state that Outlaw failed to prove that her medical condition was caused by her exposure to chemicals at work, and coherently explain the Board's reasons for reaching this conclusion.

### 2. Evidentiary Support for the Board's Conclusion

Outlaw contends that the Board's rejection of her claim for benefits was contrary to the evidence. As noted above, we will only overturn a negative judgment like this one if there is no substantial evidence and reasonable inferences which can be drawn therefrom to support the Board's findings and conclusion such that reasonable people would be compelled to reach a conclusion contrary to the decision of the Board. We cannot say here that the evidence is undisputed and leads inescapably to a result contrary to the board's finding.

■■■■■ As claimant, Outlaw bore the burden of proving that her respiratory condition arose out of her employment by establishing a causal connection between her work and the condition. She alleged that her condition arose as a result of her exposure to chemicals at work. The question of the existence of a causal relationship between an accident and a resulting permanent medical condition is ordinarily a complicated medical question outside the

7. Our instruction in *Outlaw II* that the Board make specific findings of fact supporting the ultimate conclusion that Outlaw's condition did not arise out of her employment accordingly appears to have been improper. We also note that our directive that the Board make particular findings regarding "the chemicals Outlaw was actually exposed to, Outlaw's degree of susceptibility to those chemicals, and the possibility that the cumulative effect of exposure to the chemicals in the factory could create occupational asthma," 758 N.E.2d 69, may have been a diffi- cult task to fulfill as there was no evidence specifically connecting Outlaw's condition to Outlaw's exposure to any chemical other than hydrochloric acid, no evidence regarding Outlaw's degree of susceptibility to any particular chemical used at Erbrich, and, other than the most generalized statements that Outlaw's condition was caused by her exposure to various unidentified chemicals at work, there was no expert testimony that the cumulative effect of exposure to the particular chemicals used at Erbrich's facility was causally connected to Outlaw's condition.

understanding of laypersons, and expert testimony on the issue is required. *Daub,* 629 N.E.2d at 877–78. This is because an expert, unlike a lay witness, is competent to deduce inferences from facts through the application of scientific principles. *Id.* at 878. There is no dispute in this case that expert testimony was necessary to explain the complex nature of any relationship between Outlaw's exposure to chemicals at work and her respiratory condition. However, an expert's opinion may be so lacking in probative value as to be insufficient to prove the existence of a causal relationship. *See id.* at 878. While the admissibility of an expert's opinion does not require the expert to couch an opinion in terms of a particular level of certainty, an opinion regarding causation that lacks reasonable certainty or probability is insufficient by itself to support a judgment. *Noblesville Casting Div. of TRW v. Prince,* 438 N.E.2d 722, 731 (Ind.1982). Further, an expert's opinion is insufficient to establish causation when it is based only upon a temporal relationship between an event and a subsequent medical condition. *Hannan v. Pest Control Services, Inc.,* 734 N.E.2d 674, 682 (Ind.Ct.App.2000), *trans. denied.* In particular, when an expert witness testifies in a chemical exposure case that the exposure has caused a particular condition because the plaintiff was exposed and later experienced symptoms, without having analyzed the level, concentration or duration of the exposure to the chemicals in question, and without sufficiently accounting for the possibility of alternative causes, the expert's opinion is insufficient to establish causation because it is based primarily on the existence of a temporal relationship between the exposure and the condition and amounts to subjective belief and unsupported speculation. *Id.* at 680–82. Ultimately, the Board is free to accept or reject expert testimony. *Hill,* 651 N.E.2d at 787.

Outlaw introduced expert testimony of Dr. Garcia and Dr. Houser to carry her burden of proof on the issue of causation. As noted above, Dr. Garcia testified that Outlaw's exposure to "harmful agents" at work probably caused her respiratory condition. When asked about which of these "harmful agents" caused her condition, however, Dr. Garcia stated that it was "very difficult to pinpoint which agent in a combination of chemicals is capable of producing a particular syndrome when one or more of them may be injurious in and of themselves." (R. 141–142.) As for those agents that "may be injurious," Dr. Garcia focused primarily on hydrochloric acid.[8] He expressed his opin-

---

**8.** Dr. Garcia also testified that Outlaw produced and applied labels with an adhesive that contained asthmagine, and stated that asthmagine is "a chemical capable of producing and inducing occupational asthma." Dr. Garcia did not describe the nature of Outlaw's exposure to the chemical, did not state how much of the chemical Outlaw was exposed to or for how long, and most importantly, never actually said that he thought Outlaw's condition was caused by exposure to the substance. He only said that the condition from which she suffered could result from exposure to the chemical. In the absence of any indication that Dr. Garcia had more specific information regarding Outlaw's alleged exposure to this substance, and with-

out some indication that Dr. Garcia thought that Outlaw's condition was caused by asthmagine, Dr. Garcia's generalized testimony about this chemical is totally insufficient to establish a causal relationship between the presence of the asthmagine at work and Outlaw's resulting medical condition. *See Noblesville Casting Div. of TRW,* 438 N.E.2d at 722; *Hannan,* 734 N.E.2d at 682. As for other chemical substances, Dr. Garcia alluded to the presence at Erbrich's facility of ammonia, sodium hypochlorite, acetic acid, formaldehyde and fabric softener. Dr. Garcia did not, however, state that those substances could cause occupational asthma, and did not attempt to explain the extent and duration of Outlaw's exposure to those substances or to

ion that inhalation of hydrochloric acid fumes emitted from spilled toilet bowl cleaner probably led to Outlaw's condition. In Dr. Garcia's words,

> I believe that hydrochloric acid, repetitive exposure to significant concentration of that agent could produce by itself the abnormalities that we see in Miss Outlaw.... I tend to gravitate towards the idea ... that acid fumes such as hydrochloric acid ... likely played a very important role in her subsequent lung dysfunction.... [I] believe that this is something that is a syndrome ... that must be explained by additional exposure such as acid fumes.

(R. 141–142.) As this Court recognized in *Outlaw I*, this testimony was probative of the cause of Outlaw's condition in that it tended to establish a causal connection between Outlaw's exposure to hydrochloric acid and her condition.

Erbrich responded to this evidence by proffering the testimony of Dr. Waddell, who stated that Outlaw could not have sustained the lower-respiratory tract injuries described by Dr. Garcia through the inhalation of hydrochloric acid fumes because the acid in the toilet bowl cleaner would not have vaporized for inhalation if the toilet bowl cleaner had spilled, and because even if it had, Outlaw had not sustained the kind of acid burns to the upper respiratory tract one would expect to find in such a case. When asked about whether the remainder of the actual ingredients of the toilet bowl cleaner to which Outlaw claimed to have been exposed would have caused her condition, Dr. Waddell replied, "[n]o, not really." [9] Rather,

relate such exposure to Outlaw's condition. Again, a generalized statement that a person's exposure to "chemicals" or "harmful agents" at work has caused a particular condition is insufficient to show causation without some information regarding the nature, extent, amount and duration of the exposure, and without some indication that any of the unspecified substances are known to cause the condition in question. *See id.*

9. In *Outlaw I*, 742 N.E.2d 526, we stated that Dr. Waddell "admitted that Outlaw's respiratory problems might have been caused by an allergy or specific sensitivity to one of the components of the toilet bowl cleaner." *Id.* at 531. As noted above, however, Dr. Waddell stated that there were no other chemicals in the toilet bowl cleaner that could have caused Outlaw's condition. He went on to testify as follows:

> If we look at the other things that are in there, the only other thing, as far as the active ingredient[s], are these two detergents. And I just pointed out that the n-alkyl—and they tell the composition of the carbon chains—and dimethyl benzyl ammonium chlorides, and dimethyl ethylbenzyl ammonium chlorides, those are detergents, cationic detergents, and they are not going to volatilize at all. They are strongly water soluble, and you're going to get zero of those coming off in the air, as well as the hydrogen chloride, because of the azeotrope situation I pointed out before. Now, the only other things that are in there—I have no idea what they are specifically—are corrosion inhibitors; there is dye.... Corrosion inhibitors, I don't know what they are, but they're typically antioxidant kinds of compounds that are going to be very water soluble. If she had an allergy, a specific allergy to some of these things—they probably have perfumes in there, too, to make them smell good. That's a typical thing to put in there. If she had an allergy, or if she had a specific sensitivity to those, those could be tested for directly, the perfumes and things of that sort. And I don't know that anybody paid any attention to that, because the concentrations are so low that they are virtually unknown to cause problems of that sort.

(R. 65–66.) This testimony does not appear to constitute Dr. Waddell's admission that Outlaw's condition might have been caused by an allergy or specific sensitivity to a component of the toilet bowl cleaner. Dr. Waddell did not testify that a person with an allergy or specific sensitivity to one of the components of the toilet bowl cleaner could develop the kind of respiratory problems suffered by Outlaw. Dr. Waddell only testified that if Outlaw

according to Dr. Waddell, Outlaw's condition was attributable to her history of cigarette smoking.

The Board found Dr. Waddell's refutation of Dr. Garcia's theory to be persuasive. As noted above, and as recognized in *Outlaw I*, the Board was entitled to weigh the evidence and to reject Dr. Garcia's testimony. The Board was similarly not required to credit the testimony of Outlaw's other expert, Dr. Houser. While Dr. Houser was sure that Outlaw's condition was caused by her exposure to various unspecified chemicals at work, he admitted that no one knew which chemical could have caused the condition because insufficient testing and studies had been performed. This is in effect an admission that there was no scientific basis for the existence of a causal relationship, and his testimony is accordingly lacking in probative value. He nevertheless stood by his testimony because Outlaw's symptoms arose shortly after her reported exposure to the toilet bowl cleaner. As noted above, however, when the existence of a causal relationship between an accident and a subsequent medical condition is sufficiently complex to require expert medical testimony, causation may not be established merely by reference to the existence of a temporal relationship between the event and the condition. *See Hannan*, 734

N.E.2d at 682. In sum, Dr. Houser's testimony was insufficient to establish causation.

Our review of the Board's findings and the pertinent evidence in the record does not convince us that the evidence leads inescapably to the conclusion opposite to that reached by the Board such that reasonable persons would be compelled to reach the contrary conclusion. Rather, the evidence was in dispute at the hearing. The Board weighed the evidence and determined that Outlaw failed to prove that her respiratory condition arose out of her employment. Under the circumstances, we may not disturb the Board's conclusion.

## Conclusion

In sum, the Board's findings are sufficient to demonstrate the reasons for its ultimate conclusion that Outlaw failed to carry her burden to prove that her respiratory condition arose out of her employment with Erbrich. The Board's decision is not contrary to the evidence, and must be affirmed.

Affirmed.

SULLIVAN, and MATHIAS, JJ., concur.

had an allergy or sensitivity, it could be identified through testing. Moreover, Dr. Waddell stated that no one had looked into the question because the concentrations of the items in the cleaner were virtually unknown to cause problems like those present in Outlaw. It is possible that Outlaw could have extracted an admission from Dr. Waddell that her condition might have resulted from exposure to the other ingredients of the toilet bowl cleaner upon proper questioning, but there is no indication in the deposition transcript that she did so.

In any event, even if Dr. Waddell had conceded the possibility that Outlaw's condition could have been caused by exposure to certain chemicals, this concession would not by itself establish a causal connection between the additional ingredients in the toilet bowl cleaner and Outlaw's condition, because a simple concession as to speculative possibility hardly amounts to a reasonable probability regarding the existence of a causal relationship. And there was no other evidence tying these other chemicals to Outlaw's condition, because none of Outlaw's experts appear to have been provided with an accurate list of the ingredients of the toilet bowl cleaner prior to rendering an opinion regarding the cause of Outlaw's condition, and neither Dr. Garcia nor Dr. Houser testified that these ingredients led to Outlaw's problems.