**Audrey TRIPLETT, Appellant–Plaintiff,**

v.

**USX CORPORATION,[1] Appellee–Defendant.**

**No. 93A02–0803–EX–300.**

Court of Appeals of Indiana.

Sept. 24, 2008.

---

1. USX Corporation is now known as United States Steel Corporation.

Sandra E. O'Brien, Allan J. Mindel, Merrillville, IN, Attorneys for Appellant.

Elizabeth M. Bezak, Singleton, Crist, Austgen & Sears, LLP, Munster, IN, Attorney for Appellee.

**OPINION**

CRONE, Judge.

### Case Summary

Audrey Triplett appeals the decision of the Full Worker's Compensation Board ("the Board") finding that she failed to establish that she was permanently and totally disabled, that she sustained a five-percent permanent partial impairment ("PPI") rating from an at-work accident that occurred September 20, 2001 ("the Accident"), and that she failed to prove that she sustained vertigo,[2] or any resulting impairment from vertigo, as a result of the Accident. We affirm.

### Issues

Triplett raises multiple issues; however, we address only the following two restated issues:

I. Whether Triplett waived her argument that the physician records of United States Steel Corporation ("USS") constitute an admission that she suffers vertigo as a result of the Accident, and

II. Whether the Board erred in rejecting medical opinion as to the cause of her vertigo on the ground that a differential diagnosis was not performed.

USS raises the following issue:

III. Whether it is entitled to a credit for two weeks of temporary total disability payments.

### Facts and Procedural History

The evidence supporting the Board's decision and the uncontradicted adverse evidence follow. On September 20, 2001, Triplett was employed by USS as a tractor

---

2. Vertigo is "a sensation of motion in which the individual or the individual's surroundings seem to whirl dizzily." Merriam–Web- ster Online, http://www.merriam-webster.com/dictionary/vertigo.

operator, a position classified in the light physical tolerance level. That day, while descending a ladder on the side of a tractor, she fell backwards to the ground, hitting the back of her head. She was taken by ambulance to Methodist Hospital. Triplett did not complain of dizziness either to the EMTs or to the doctors at Methodist. A CT scan taken that day at Methodist showed no abnormalities.

From the day of the Accident through January 27, 2003, USS provided extensive medical care to Triplett. She saw a variety of healthcare providers, including an orthopedic physician and a neurologist, and she was provided balance therapy and work conditioning. After receiving several complaints of dizziness, USS physicians referred her to Dr. George Abu–Aita, a neurologist, on October 2, 2001. He performed a neurological examination and ordered an MRI, both of which were deemed unremarkable. Appellant's App. at 97.

From February through October 2002, Triplett underwent orthopedic [3] and vestibular (balance) therapy at Balance Centers of America ("BOA"). Initially, several tests related to her complaints of dizziness were administered, regarding which a therapist made the following entry:

> Results of additional objective testing validate [Triplett's] deficits which include a Vestibulo–Ocular Reflex (VOR) [4] stabilization deficit; deficits with her somatosensory system functioning; compromises with her static and dynamic balance and ambulation skills when sensory conditions are altered; and a Benign Paroxysmal Positional Vertigo (BPPV).[5]

Id. at 106. At the time Triplett's therapy was discontinued in October 2002, the physical therapist at BOA noted that the "intensity of her symptoms of dizziness, nausea, and disequilibrium have decreased overall, however, continue to persist at a mild level depending on the activity she is performing." Id. at 113.

On September 5, 2002, Triplett underwent a functional capacity evaluation ("FCE"). Id. at 269. The results indicate that Triplett was able to perform in the sedentary light category in above-the-waist activities and the light category in below-the-waist activities. These were the same performance categories indicated in her 1991 FCE. Appellee's App. at 97.

Prior to the Accident, Triplett had a history of pre-existing medical conditions. In March 1989, she sustained an ankle injury as a result of an at-work accident for which she received a PPI rating of five percent. From December 1996 until December 1998, psychiatrist Dr. Ara Yeretsian treated Triplett for anxiety with panic attacks and dysthymic (mood) disorder, for which he prescribed medication. During her panic attacks, Triplett experienced dizziness, lightheadedness, nervousness, heart palpitations, shortness of breath, and sleep deprivation. From October 11, 1996, until February 24, 1997, she was off work due to

---

**3.** Orthopedics is "a branch of medicine concerned with the correction or prevention of deformities, disorders, or injuries of the skeleton and associated structures (as tendons and ligaments)." Merriam–Webster Online, http://www.merriam-webster.com/dictionary/orthopedics.

**4.** "The Vestibular–Ocular Reflex functions to ensure that your eyes move in the same speed and direction as your head to ensure that you can track or follow objects in your sight line.

Impairment of the vestibular-ocular reflex may result in chronic dizziness and imbalance." ENTcare, http://www.entcare.org/Patient Education/Patient Education/Vestibular Autorotation Test.html.

**5.** BPPV is one of the most common disorders that can cause vertigo. MayoClinic.com, http://www.mayoclinic.com/health/vertigo/DS00534.

these illnesses. Triplett was in a car accident causing her low back pain with radiation and was off work from April 16, 1997, to March 1, 1998. When she returned to work, she wore a back brace on a daily basis and experienced constant back pain. She was also involved in two previous car accidents in 1982 and 1984 from which she sustained injuries. In 1998, she incurred a wrist injury as a result of an at-work accident. She required multiple surgeries and missed work from October 14, 1998, to April 23, 2001. As a result of this injury, she sustained a PPI of twenty-one percent. Additionally, prior to the Accident Triplett took medication three times a day for high blood pressure. She experienced and received treatment for associated symptoms of dizziness. She also experienced dizziness with ear infections.

USS physicians referred Triplett to Dr. Suresh Mahawar for an Independent Medical Examination ("IME") and PPI evaluation. Dr. Mahawar's January 27, 2003, report concluded,

— It appears that Ms. Triplet[t] fell at work on 9/20/01 and sustained a mild concussion of brain and back sprain.

— She has received an extensive course of treatment for her injury.

— She now has reached the state of maximal medical improvement ["MMI"] and does not need any further treatment.

— She has 5% impairment as a whole person according to the 5th edition of AMA guide.

Appellant's App. at 326. USS Medical Director Craig Tokowitz, D.O., issued Triplett the same impairment rating. *Id.* at 256.

On April 8, 2003, Triplett obtained a Board-ordered IME with Dr. Kristie George. Dr. George's report indicates the following diagnoses: (1) mild concussion, (2) benign paroxysmal positional vertigo, (3) fibromyalgia, and (4) chronic neck pain, back pain, and occipital pain "likely secondary to # 3." *Id.* at 143. In Dr. George's opinion,

The vertigo that [Triplett] continues to experience is very likely secondary to the injury sustained September of 2001. With regard to the vertigo, [Triplett] should be able to return to work with the restrictions of no squatting, no climbing stairs and no frequent changes in position, i.e. sitting to standing and no repetitive side to side head movements such as what might be incurred on an assembly line.

*Id.*

On May 29, 2003, Triplett filed her application for adjustment of claim with the Board. In November 2004, Triplett received an evaluation from Dr. Daryl L. Fortson to submit to the Single Hearing Member ("SHM") and the Board. Dr. Fortson did not specialize in the fields of neurology or psychology and was not a member of the American Academy of Disability Evaluating Physicians, although he later became a member. Dr. Fortson listed the following diagnoses:

1. Closed head injury.

2. Cerebellar dysfunction secondary to 1.

3. Severe vertigo and hearing deficits.

4. Traumatic myositis.

5. Bilateral shoulder arthritis.

6. Cervical degenerative joint disease.

7. Lumbar stenosis.

8. Early left knee arthritis.

9. Depression.

10. History of anxiety and panic attacks.

11. Left supraspinatus tendonitis and bilateral rotator cuff tendonitis.

*Id.* at 121. He found that because Triplett had returned to work with full duty after she injured her wrist, she must have been functioning at a high level before the Accident. He therefore determined that she was extremely debilitated from her vertigo and issued a PPI of forty percent. *Id.*

On February 8, 2007, the SHM conducted a hearing and issued an order that was affirmed and adopted by the Board on April 27, 2008. The fourteen-page order, reads, in relevant part,

### FINDINGS OF FACT

As a preliminary matter, it is observed that portions of [Triplett's] testimony at the hearing (and as found in the two (2) deposition transcripts—Plaintiff's Exhibit # 24) were not credible and conflicted with the other credible evidence.

. . . .

9. [Triplett] suffered from multiple psychological conditions, and sought treatment for a variety of different conditions for years before September 20, 2001, including, a mood disorder (dysthymic disorder), anxiety, panic attacks and depression. When she experienced anxiety and panic attacks prior to the accident, she had symptoms of lightheadedness and dizziness. For her pre-existing psychological conditions, she took a variety of different medication on a daily basis for years prior to September 20, 2001. She also took medication on a daily basis for her blood pressure and had done so for years prior to September 20, 2001.

10. Prior to September 20, 2001, [Triplett's] psychological and physical conditions (i.e. blood pressure, ear infections, sinusitis) caused her to experience numerous symptoms for which she sought treatment including, but not necessarily limited to, one or more of the following, nervousness, dizziness, vomiting, lightheadedness, heart palpitations, blurred vision, shortness of breadth [sic] and sleep deprivation.

. . . .

12. [Triplett's] pre-existing emotional issues (namely, anxiety, panic attacks and depression) caused her limitations in activities of daily living [ADL], such as shopping and driving. On at least one occasion prior to September 20, 2001, she told USS that she did not shop or drive. She was limited in standing for any length of time after the 1997 accident and limited in ADL prior to September 20, 2001.

13 [Triplett's] limitation with driving is due to her pre-existing psychological conditions and not the September 20, 2001, accident.

. . . .

21. . . . . When [Triplett] was discharged from therapy on December 4, 2001, [Triplett] was independent with ADL and functional activities.

22. [Triplett] underwent balance therapy at Balance Centers of America [BOA] for her complaints of dizziness from July 1, 2002, through October 16, 2002. On July 19, 2002, [Triplett's] symptoms appeared "to be myofascial in nature ... and generalized weakness." [Triplett] demonstrated "muscle guarding" and inconsistencies with her physical therapy.

. . . .

24. Even, assuming, arguendo, that objective testing might confirm a

diagnosis of vertigo, no physician engaged in any "differential diagnosis" to evaluate the multiple potential causes of [Triplett's] vertigo symptoms (which could be due to her psychological make-up, her medication, or other physical conditions which are not [ ] related to [the Accident] ).

25. Objectively, the treatment at BOA helped [Triplett] and, upon her discharge, she was able to ambulate at various speeds across different surfaces, perform repetitive cervical movements and ambulate both forward and backward.

. . . .

27. During her work-conditioning, in July 2002, [Triplett] was able to perform stair negotiation, squats, gait exercise, and lift a box floor to waist with twenty-eight (28) pounds of resistance a total of forty (40) times; overhead seated reaching with seven and one-half (7.5) pounds resistance a total of thirty (30) times. She had "minimal deficits" in gait, posture in sitting and standing, cervical ROM, lumbar ROM, strength in her upper and lower extremities and endurance. . . . .

. . . .

29. [Triplett] underwent a Functional Capacity Evaluation [FCE] on September 5, 2002, at Advanced Physical Therapy [APT]. The results of the objective FCE are questionable especially because [Triplett] failed to set forth valid and reliable effort. [Triplett's] pain rating was described as "not sensible." Her movement patterns were not correct and her "distracted lumbar movement patterns not consistent with ROM."

Furthermore, her limitations were not consistent with her diagnosis. She even claimed that she could not walk "any minutes" and demonstrated no ability to stair climb or squat (even though she had performed these task[s] multiple times during her work-hardening). The results of the FCE were 28% reliable and 68% valid. Based upon the unreliable and invalid findings, work restrictions were issued. The results of the FCE established that [Triplett] could perform work in the "sedentary-light" and "light" categories.

30. The limitations and/or restrictions imposed by the FCE results and Dr. George were not related to the [Accident]. [Triplett] tested in the same levels as she had during the 1991 FCE and the additional restrictions imposed by Dr. George (no squatting, no stair climbing, and no frequent changes of position) were based on subjective complaints which can be related to multiple different potential causes, unrelated to the [Accident]. The restrictions imposed were based upon unreliable and/or invalid effort by [Triplett] and/or based upon her subjective complaints of pain and dizziness which are found not to be reliable. It has not been established, by a preponderance of credible evidence, that the restrictions imposed by the FCE and Dr. George were as a result of the [Accident].

. . . .

33. [Triplett] obtained a Board-appointed IME with Dr. Kristie George in Indianapolis, Indiana on April 3, 2003. . . . . Throughout her examination of [Triplett], Dr.

George noted that [Triplett] may be less than credible in her self-serving subjective complaints. For example, she found that "she sits very still when talking about her vertigo and pain, moves freely at other times when she is talking about other issues."

34. [Triplett] did not return to work after having reached MMI. She retired from USS, applied for and received a monthly pension from USS beginning July 2003. She has not looked for any employment since September 20, 2001.

. . . .

36. Presently, [Triplett] is on a daily regimen of taking eight (8) different medications to address a myriad of different conditions including, blood pressure and emotional issues. A review of a well-recognized resource, Physicians Desk Reference, establishes that the medication she has been prescribed has potential side effects of headaches, dizziness, nausea, vomiting, fainting, lightheadedness, drowsiness, depression, memory problems and decreased mental alertness.

. . . .

44. [Triplett's] anxiety and panic attacks either remained the same or decreased after the [Accident].

45. [Triplett's] treatment for her psychological conditions remained the same after the [Accident], as before, which included medication and therapy.

46. [Triplett] did not suffer any mental or psychological limitation as a result of the [Accident].

47. There is no credible evidence to suggest that the [Accident] caused or aggravated any of [Triplett's] pre-existing psychological conditions. Further, [Triplett's] pre-existing psychological conditions were not caused by or aggravated by the [Accident] and the [Accident] did not play any role in causing or contributing to [Triplett's] current psychological state.

48. [Triplett's] pre-existing conditions would have progressed to a permanent and total disability even in the absence of the [Accident] and may have rendered [Triplett] permanently and totally disabled even before the [Accident].

49. [Triplett] experienced "spinning" sensations, lightheadedness and dizziness with anxiety and panic attacks after [the Accident], and dizziness can be a symptom of panic.

. . . .

51. [Triplett's] difficulties or limitations on driving are due to her preexisting psychological disorders, and not due to the [Accident].

52. The evidence concerning Activities of Daily Living is inconsistent and contradictory, at best. However, as early as December 4, 2001, (less than three (3) months after her fall), [Triplett] was independent with her activities of daily living and functional actions (as confirmed by the discharge summary from physical therapy). On September 27, 2002, [Triplett] performed yard work for two days. In November 2001, [Triplett] was able to move a lot better and perform household chores like vacuuming, washing dishes, and dusting. She could cook, read, wash dishes and dust.

. . . .

58. Several potential causes for symptoms of vertigo (i.e. dizziness and lightheadedness) exist in this case including, [Triplett's] fibromyalgia, her psychological conditions, her medical conditions (i.e. ear infections, blood pressure) or potential side effects of medications she takes. No objective testing was performed, or any analysis for that matter, to determine whether [Triplett's] subjective complaints of dizziness and lightheadedness resulted from conditions other than the Accident.

59. There has been no showing that the vertigo [Triplett] has, assuming this diagnosis to be valid, is attributed to the September, 2001, fall or that other potential causes of her vertigo have been reliable considered and ruled out.

60. While an objective test was done to confirm the presence of vertigo prior to therapy, no objective testing to confirm [Triplett's] subjective complaints of vertigo was performed after [Triplett] was discharged from balance therapy.

### CONCLUSIONS OF LAW

. . . .

7. USS submitted a PPI rating by Dr. Mahawar dated January, 2003, and an opinion of Craig Tokowitz, D.O., dated March 6, 2003, while [Triplett] has submitted a PPI rating by Darryl L. Fortson, M.D. dated November, 2004.

8. [Triplett] sustained a 5% whole person impairment rating.

9. The ratings by Dr. Fortson are not reliable or credible since the same are dependent upon the validity of the history provided to him by [Triplett] and do not credibly outline what impairments [Triplett] sustained from the [Accident]. Dr. Fortson's exam took place almost two (2) years after [Triplett] reached MMI and appear to take into account conditions unrelated to the [Accident] including degenerative limitations and limitations to parts of [Triplett's] body, which did not sustain injury in the [Accident].

10. [Triplett] has failed to prove, by a preponderance of credible evidence, that she sustained vertigo, or any resulting impairment from vertigo, as a result of the [Accident].

11. [Triplett] did not sustain any impairment as a result of her claimed vertigo. If any impairment for her claimed vertigo does exist, the impairment relating to the vertigo was not caused by the [Accident]. An alleged temporal connection is not sufficient to establish causation. *Outlaw v. Erbrich Products, Inc.*, 777 N.E.2d 14 (Ind.App.2002) (in worker's compensation action, opinion is insufficient to establish causation when it is based only upon temporal relationship between an event and a subsequent medical condition). To infer that the [Accident] caused [Triplett's] subjective complaints of vertigo amounts to mere speculation, conjecture and guess and would constitute an unreasonable inference as a matter of law because no "differential diagnosis" was performed to determine whether her subjective complaints were caused by conditions other than the [Accident].

12. Dr. Fortson's opinions and conclusions regarding vertigo are based

on the subjective complaints and rely on the truthfulness of the history provided by [Triplett], which are found not to be credible. Furthermore, Dr. Fortson's opinions concerning vertigo do not take into consideration the objective neurological testing (diagnostic and visual observation) which showed multiple negative results, within a short amount of time after the [Accident] and his opinions are not consistent with the American Medical Association Guides. Finally, Dr. Fortson did not consider 1) that [Triplett] had prior complaints of symptoms of vertigo before the [Accident]; and 2) that other causes could explain her subjective complaints of vertigo symptoms.

13. [Triplett] has failed to prove, by a preponderance of credible evidence, that she suffered any ADL limitations as a result of the [Accident].

*Id.* at 19–31 (footnote omitted). The Board awarded Triplett worker's compensation at the statutory rate for her five-percent whole-person impairment rating. Triplett appeals.

## Discussion and Decision

 Triplett challenges the Board's award on a number of levels, all relating to the denial of her vertigo claim. The Board, as the trier of fact, has a duty to issue findings that reveal its analysis of the evidence and that are specific enough to permit intelligent review of its decision. *Shultz Timber v. Morrison,* 751 N.E.2d 834, 836 (Ind.Ct.App.2001), *trans. denied.* In evaluating the Board's decision, we employ a two-tiered standard of review. First, we review the record to determine if there is any competent evidence of proba-

tive value to support the Board's findings. *Id.* We then assess whether the findings are sufficient to support the decision. *Id.* We will not reweigh the evidence or assess witness credibility. *Id.*

 Triplett, as the claimant, had the burden to prove a right to compensation under the Worker's Compensation Act ("the Act"). *See Bowles v. Gen. Elec.,* 824 N.E.2d 769, 772 (Ind.Ct.App.2005), *trans. denied.* As such, she appeals from a negative judgment. When reviewing a negative judgment, we will not disturb the Board's findings of fact unless we conclude that the evidence is undisputed and leads inescapably to a contrary result, considering only the evidence that tends to support the Board's determination together with any uncontradicted adverse evidence. *Cavazos v. Midwest Gen. Metals Corp.,* 783 N.E.2d 1233, 1239 (Ind.Ct.App.2003). The Board is not obligated to make findings demonstrating that a claimant is not entitled to benefits; rather, the Board need only determine that the claimant has failed to prove entitlement to benefits. *Outlaw v. Erbrich Products Co.,* 777 N.E.2d 14, 26 (Ind.Ct.App.2002) (citing *Hill v. Worldmark Corp./Mid America Extrusions Corp.,* 651 N.E.2d 785, 786 (Ind.1995)), *trans. denied* (2003). "While this court is not bound by the Board's interpretations of law, we should reverse only if the Board incorrectly interpreted the Worker's Compensation Act." *Luz v. Hart Schaffner & Marx,* 771 N.E.2d 1230, 1232 (Ind.Ct.App. 2002). "We will construe the Worker's Compensation Act liberally in favor of the employee." *Id.*

## I. USS Physician Records/Admission of Causation

 Triplett argues that the diagnoses of vertigo made by USS physicians as shown by USS occupational health records constitute a binding admission that

she suffers from vertigo as a result of the Accident. Initially, we note that the parties filed a stipulation of facts and issues. Appellant's App. at 32–33. This issue was not part of the stipulation. While parties reserved the right to argue issues that might arise during the course of the hearing, Triplett failed to make this argument before either the SHM or the Board. "Where neither the hearing member nor the Board addresses an issue, a litigant cannot raise that issue for the first time on appeal." *Ind. Mich. Power Co. v. Roush*, 706 N.E.2d 1110, 1115 n. 4 (Ind.Ct.App. 1999), *trans. denied*. Therefore, Triplett has not preserved this issue for our review.

Moreover, Triplett has failed to present a cogent argument or cite relevant authority. Triplett asserts that the physician records are binding admissions. However, the substantive law cited by Triplett involves admissibility of a certain type of hearsay statement; that is, a statement against the interest of a party that constitutes an exception to the hearsay rule. *See* Appellant's Br. at 15 (citing *Uebelhack Equip., Inc. v. Garrett Brothers, Inc.*, 408 N.E.2d 136, 138 (Ind.Ct.App.1980); *Marsh v. Lesh*, 164 Ind.App. 67, 70–71, 326 N.E.2d 626, 628 (1975); *Senff v. Estate of Levi*, 515 N.E.2d 556, 559 (Ind.Ct.App. 1987)). As such, this law is inapplicable to her argument.

Further, the principal case she relies upon to support her argument does not remotely address the question presented here. *See id.* at 16 (citing *W. & S. Life Ins. Co. v. Danciu*, 217 Ind. 263, 275, 26 N.E.2d 912, 917 (1940) (determining that opinion testimony of lay witnesses as to whether insured appeared healthy was competent to the issue of onset of insured's tuberculosis and merely observing that insurance company's physician report finding insured to be in good health at time

policy was issued was competent evidence on insured's health at that time)). Triplett's failure to advance a cogent argument and cite relevant authority waives this issue for our review. *See* Ind. Appellate Rule 46(A)(8)(a) (requiring that argument contain contentions of appellant on the issues presented, supported by cogent reasoning, and that each contention be supported by citations to authorities, statutes, and appendix or parts of the record on appeal relied on); *see also Loomis v. Ameritech Corp.*, 764 N.E.2d 658, 668 (Ind. Ct.App.2002) (finding waiver due to lack of cogent argument), *trans. denied*.

## II. Differential Diagnosis and Causation

 Triplett takes issue with the Board's rejection of the evidence showing that the Accident caused her vertigo. For an injury to be compensable under the Act, it must both arise "out of" and "in the course of" the employment. *Ind. Mich. Power Co.*, 706 N.E.2d at 1114. An injury arises out of employment when there is a causal relationship between the employment and the injury. *Muncie Ind. Transit Auth. v. Smith*, 743 N.E.2d 1214, 1216 (Ind.Ct.App.2001). A causal relationship exists when the injury would not have occurred in the absence of the accident. *Daub v. Daub*, 629 N.E.2d 873, 877 (Ind. Ct.App.1994). Ultimately, the issue of whether an employee's injury arose out of and in the course of her employment is a question of fact to be determined by the Board. *Conway ex rel. Conway v. Sch. City of E. Chicago*, 734 N.E.2d 594, 597 (Ind.Ct.App.2000), *trans. denied*.

Specifically, Triplett contends that the Board erred in rejecting medical opinion that her vertigo was caused by the Accident on the grounds that a differential diagnosis was not performed. She asserts that a differential diagnosis is not required, and that therefore the following

findings and conclusion are erroneous: finding 24 (finding that no physician performed a differential diagnosis), finding 58 (finding that there are several potential causes for the symptoms of vertigo), finding 59 (finding that there has been no showing that Triplett's vertigo was caused by the Accident), and conclusion 11 (concluding that Triplett's vertigo was not caused by the Accident and that to make such an inference would constitute mere speculation as a matter of law because no differential diagnosis was performed).

A differential diagnosis is a standard scientific technique accomplished by determining the possible causes of a patient's symptoms and then eliminating each of these potential causes until isolating one that cannot be ruled out or by determining which of those that cannot be ruled out is the most likely. *Lennon v. Norfolk and W. Ry. Co.*, 123 F.Supp.2d 1143, 1153 (N.D.Ind.2000). A reliable differential diagnosis is performed after completing a physical examination, taking a medical history, and reviewing clinical tests, including laboratory tests. *Id.* Our review of the relevant Indiana case law shows that this scientific technique is of particular significance in chemical exposure cases. *See Outlaw*, 777 N.E.2d 14; *Hannan v. Pest Control Servs., Inc.*, 734 N.E.2d 674 (Ind. Ct.App.2000).

In its appellee's brief, USS argues that *Muncie Indiana Transit Authority v. Smith*, 743 N.E.2d 1214 (Ind.Ct.App.2001), and *Outlaw*, 777 N.E.2d 14, provide a basis for the Board to *consider* the necessity of a differential diagnosis. Appellee's Br. at 21. We observe that finding 59 indicates that the Board did not merely consider the desirability of a differential diagnosis to assess the weight of the causation evidence, but rather determined that the failure to perform the procedure rendered all causation evidence valueless. Consequently, we will examine *Muncie* and *Outlaw* to determine whether a differential diagnosis is a necessary element for competent causation evidence.

USS asserts, "In *Muncie*, the court found that *plaintiff's opinion* on causation was not competent when *no expert evaluated* the 'many causes of carpal tunnel syndrome' and when the plaintiff had a prior history of hand numbness, which may be linked to his exposure to Agent Orange in Vietnam." *Id.* (citing *Muncie*, 743 N.E.2d at 1217–18) (emphases added). Our review of *Muncie* shows that it held that "when the cause of injury is not one which is apparent to a lay person and multiple factors may have contributed to causation, expert evidence on the subject is required." 743 N.E.2d at 1217. Thus, *Muncie* does not address whether a differential diagnosis is required to establish causation and is therefore inapposite.

Furthermore, in the instant case, Dr. George, whose expertise has not been questioned, specifically stated that Triplett's vertigo "is very likely secondary to the injury sustained September of 2001." Appellant's App. at 143. While ultimately the credibility and weight of Dr. George's opinion lies within the Board's domain, we can say that it is *some* evidence that Triplett's vertigo was caused by the Accident. Therefore, *Muncie* certainly does not provide support for the Board's finding that there was "no showing" that Triplett's vertigo was caused by the Accident. *Id.* at 27, finding 59.[6]

---

**6.** Additionally, Dr. George specifically stated that Triplett's complaints of diffuse skeletal pain were not related to the Accident and instead attributed these complaints to her fibromyalgia. The statement demonstrates that Dr. George was aware of Triplett's multiple conditions and implicitly ruled out other

Turning now to *Outlaw*, we observe that the Board relied on that case to support conclusion 11, in which it stated that any impairment Triplett suffered from vertigo was not caused by the Accident and that to infer that the Accident caused her vertigo amounts to mere speculation "as a matter of law" because no differential diagnosis was performed. *Id.* at 29. Specifically, the Board cited *Outlaw* for the proposition that expert opinion is insufficient to establish causation when it is based only upon a temporal relationship between an event and a subsequent medical condition. We find that in relying on one isolated sentence from *Outlaw*, the Board misapplied its holding.

In *Outlaw*, the claimant worked on several assembly lines, including one that produced toilet bowl cleaner. She developed severe respiratory problems and brought a worker's compensation claim against her employer, Erbrich Products Company, alleging that her problems were caused by exposure to the cleaner. The Board denied her claim, concluding that she failed to prove that her medical condition was caused by her exposure to chemicals at work.

On appeal, the *Outlaw* court noted,

There is no dispute in this case that expert testimony was necessary to explain the complex nature of any relationship between Outlaw's exposure to chemicals at work and her respiratory condition. However, an expert's opinion may be so lacking in probative value as to be insufficient to prove the existence of a causal relationship. While the admissibility of an expert's opinion does not require the expert to couch an opinion in terms of a particular level of certainty, an opinion regarding causation that lacks reasonable certainty or proba-

bility is insufficient by itself to support a judgment. Further, *an expert's opinion is insufficient to establish causation when it is based only upon a temporal relationship between an event and a subsequent medical condition.* In particular, when an expert witness testifies in a chemical exposure case that the exposure has caused a particular condition because the plaintiff was exposed and later experienced symptoms, without having analyzed the level, concentration or duration of the exposure to the chemicals in question, and without sufficiently accounting for the possibility of alternative causes, the expert's opinion is insufficient to establish causation because it is based primarily on the existence of a temporal relationship between the exposure and the condition and amounts to subjective belief and unsupported speculation.

777 N.E.2d at 29 (citing *Hannan,* 734 N.E.2d at 680–82) (emphasis added).

The *Outlaw* court then analyzed Outlaw's expert causation evidence in detail. First, it reviewed Dr. Garcia's testimony that Outlaw's exposure to harmful agents at work probably caused her respiratory condition and that inhalation of hydrochloric acid fumes emitted from spilled toilet bowl cleaner probably led to Outlaw's condition. *Id.* 29–30. The *Outlaw* court noted, "[T]his testimony was probative of the cause of Outlaw's condition in that it tended to establish a causal connection between Outlaw's exposure to hydrochloric acid and her condition." *Id.* at 30.

However, the *Outlaw* court noted that ultimately the Board found Erbrich's expert's refutation of Dr. Garcia's theory to be persuasive. Erbrich's expert, Dr. Waddel, testified that Outlaw could not have sustained her respiratory tract injuries

causes to opine that Triplett's vertigo was

related to the Accident.

through inhalation of hydrochloric acid fumes. He further testified that Outlaw's condition was attributable to her history of cigarette smoking.

Finally, the *Outlaw* court noted that the Board was not required to credit the testimony of Outlaw's other expert, Dr. Houser, where he admitted that no one knew which chemical could have caused her condition because insufficient testing and studies had been performed. "This is in effect an admission that there was no scientific basis for the existence of a causal relationship." *Id.*

As our discussion of *Outlaw* reveals, the *Outlaw* court did *not* require that causation evidence be based on a differential diagnosis to be probative. In fact, the *Outlaw* court specifically noted that Dr. Garcia's causation testimony was probative even though he had not performed a differential diagnosis. In discussing whether an expert's opinion was based primarily on the existence of a temporal relationship, the *Outlaw* court noted many deficiencies which contribute to such a determination, the lack of a differential diagnosis being just one: "when an expert witness testifies in a chemical exposure case that the exposure has caused a particular condition because the plaintiff was exposed and later experienced symptoms, without having analyzed the level, concentration or duration of the exposure to the chemicals in question, *and* without sufficiently accounting for the possibility of alternative causes, the expert's opinion is insufficient to establish causation." *Id.* at 29. Accordingly, the Board erred in relying on *Outlaw* to conclude that "[t]o infer that the [Accident] caused [Triplett's] subjective complaints of vertigo amounts to mere speculation, conjecture and guess and would constitute an unreasonable inference as a matter of law because no 'differential diagnosis' was performed to determine whether her subjec-

tive complaints were caused by conditions other than the [Accident]." Appellant's App. at 29.

Further, we find no support for the Board's differential diagnosis requirement in *Hannan*, 734 N.E.2d 674. There, the plaintiffs sued a pesticide company for injuries allegedly arising from exposure to pesticides that had been applied to their residence. The pesticide company filed a motion to exclude plaintiffs' medical causation expert witnesses and moved for summary judgment. The trial court found that the plaintiffs' experts' testimony on medical causation was inadmissible under Evidence Rule 702 and entered summary judgment in favor of the company. Plaintiffs appealed.

The *Hannan* court agreed that the testimony of the plaintiffs' experts did not meet the requirements of Rule 702 for the following reasons: the experts had no relevant information regarding the exposure level of the chemicals or the dose that the plaintiffs had allegedly ingested; the ventilation system of the home was significant, but none of the experts had seen the residence or had any specific information regarding the size of the house or the configuration of the ventilating system; there was no medical or scientific literature that supported a conclusion that the chemicals to which plaintiffs were allegedly exposed could cause their symptoms; none of the experts offered theories regarding alternative reasonable causes of the symptoms displayed by plaintiffs; and the experts conceded that there were numerous causes for each symptom, but no efforts were made to investigate other possible causes. The *Hannan* court concluded,

In sum, it is apparent from the proposed testimony of the experts that they were relying on a mere temporal coincidence of the pesticide application and the plaintiffs' alleged and self-reported

illness. Such a relationship is insufficient to establish a prima facie case on the element of causation. None of the purported experts performed any testing that would rule out alternative causes of the plaintiffs' ailments. Such "differential diagnosis" testing is important in toxic tort cases so that other causes may be negated. Thus, the opinions of the plaintiffs' experts were tantamount to subjective belief or unsupported speculation.

*Id.* at 684 (citations omitted).

*Hannan* is distinguishable from the case at bar. The "accident" in *Hannan* was the exposure to the pesticides, but there was no real evidence as to the level of exposure. Here, there is no dispute regarding the Accident; Triplett fell and hit her head. Further, there is no dispute that such an injury to the head can cause vertigo, whereas in *Hannan*, the company designated expert testimony that the pesticides in question could not cause the plaintiffs' symptoms. Also, USS did not challenge the admissibility of Triplett's causation evidence; rather, it stipulated to the admissibility of the evidence. Thus, the Board's rejection of Triplett's causation evidence based solely on the absence of a differential diagnosis is not justifiable under *Hannan*.

In addition, we observe that Federal District Court Chief Judge Robert Miller, Jr., of the Northern District of Indiana[7] has expressly rejected the contention that a differential diagnosis is essential in all cases. In *James v. Marten Transport, Ltd.*, No. 3:03–CV–244RM, 2006 WL 3755322 (N.D.Ind. Dec.15, 2006), Roberta James brought a personal injury action against Marten.[8] Marten sought to exclude James's expert testimony, arguing that pursuant to the holding in *Lennon*, 123 F.Supp.2d at 1153, a differential diagnosis is required for any medical conclusion to be reliable. The *James* court found "no such holding in *Lennon*." 2006 WL 3755322 at *3. According to the *James* court, "The *Lennon* court said differential diagnosis is a reliable scientific principle and technique when properly undertaken, but in no sense held it mandatory in all cases[.]" *Id.*

We conclude that given the facts present here, the Board erred in requiring a differential diagnosis, and that therefore conclusion 11 is clearly erroneous. The Board's error in requiring a differential diagnosis also diminishes our confidence in finding 59 (finding that there has been "no showing" that Triplett's vertigo was caused by the Accident or that other potential causes of her vertigo have been reliably considered and ruled out) where Dr. George's opinion that her vertigo was caused by the Accident constitutes probative evidence. *See Outlaw*, 777 N.E.2d at 30. Although the Board need not accept Dr. George's opinion, it is unclear whether the Board discounted it because it lacked a differential diagnosis, lacked credibility, or as a result of some combination of the two. Therefore, we cannot say with confidence that the Board would have made the same determination if it had not required a differential diagnosis.

---

**7.** Chief Judge Miller is the author of the Indiana Evidence volumes of the West Indiana Practice Series (3rd ed.2007).

**8.** While not binding on Indiana courts, we observe that the Federal Rules of Appellate Procedure permit citation to unpublished opinions issued after January 1, 2007. FRAP 32.1(a). As to unpublished opinions issued before January 1, 2007, Rule 32.1(a) provides that citation to such opinions is governed by the local rules. Neither the local rules of the Northern District of Indiana nor the Indiana Rules of Appellate Procedure prohibit citation to the district court's unpublished opinion.

In light of its application of an erroneous standard, we also cannot say with confidence that the Board would reach the conclusion it did in conclusion 10 (concluding that Triplett failed to prove that she sustained vertigo as a result of the Accident). We simply cannot know how the Board would have weighed the evidence regarding causation if it had not required a differential diagnosis.

 Furthermore, it appears to us that a portion of conclusion 12, stating that Dr. Fortson failed to account for other causes of Triplett's vertigo, may have been improperly derived from the Board's error in requiring a differential diagnosis. However, we do not find that either reversal or remand for the Board to reconsider the causation evidence is warranted here, because conclusion 9 and the remaining portion of conclusion 12, both of which reject Dr. Fortson's report based on a lack of credibility, are not rendered erroneous by our conclusion. Further, we will not assess credibility on appeal. *See Shultz Timber*, 751 N.E.2d at 836. Only Dr. Fortson's report contained a PPI rating for Triplett's vertigo. Consequently, even if Triplett's causation evidence is accepted as conclusive, there is no credible evidence regarding her PPI rating for vertigo. Thus, the remaining findings and conclusions support the Board's award. *See Havlin v. Wabash Int'l*, 787 N.E.2d 379, 383 (Ind.Ct.App.2003) (concluding that erroneous findings and conclusions are superfluous and not fatal to Board's judgment where remaining valid findings and conclusion support judgment).

In addition, we need not address Triplett's challenges to findings 22, 24, 25, 30, 34, 36, 41, 44, 45, 46, 47, 48, 58, and 60 because these findings do not impact conclusions 9 and 12, and therefore even if we found that all these findings were erroneous, such error would be harmless. *See*

*id.* Therefore, we affirm the Board's award.

### III. Credit

 Triplett received Temporary Total Disability ("TTD") benefits from September 20, 2001, through February 6, 2003, and from February 23, 2003, through March 8, 2003. USS contends that it is entitled to a credit of two weeks' worth of Triplett's TTD payments toward her five-percent whole-person impairment award. The parties' stipulation of facts and issues presented this issue, but neither the SHM nor the Board addressed it. We will do so here.

 Initially, we note that Triplett did not respond to USS's argument on cross-appeal. Where an appellant fails to file a response to a cross-appeal, the cross-appellant may prevail if its brief presents a prima facie case of error. *Sand Creek Country Club, Ltd. v. CSO Architects, Inc.*, 582 N.E.2d 872, 875–76 (Ind.Ct.App.1991). Prima facie error is "error at first sight, on first appearance, or on the face of it." *Id.* at 876.

Indiana Code Section 22–3–3–7 governs temporary disability benefits and provides in relevant part,

(c) Once begun, temporary total disability benefits may not be terminated by the employer unless:

(1) the employee has returned to any employment;

(2) the employee has died;

(3) the employee has refused to undergo a medical examination under section 6 of this chapter or has refused to accept suitable employment under section 11 of this chapter;

(4) the employee has received five hundred (500) weeks of temporary total disability benefits or has been paid the maximum compensation allowed under section 22 of this chapter; or

(5) the employee is unable or unavailable to work for reasons unrelated to the compensable injury.

*In all other cases the employer must notify the employee in writing of the employer's intent to terminate the payment of temporary total disability benefits and of the availability of employment, if any, on a form approved by the board.* If the employee disagrees with the proposed termination, the employee must give written notice of disagreement to the board and the employer within seven (7) days after receipt of the notice of intent to terminate benefits. If the board and employer do not receive a notice of disagreement under this section, the employee's temporary total disability benefits shall be terminated. Upon receipt of the notice of disagreement, the board shall immediately contact the parties, which may be by telephone or other means, and attempt to resolve the disagreement. If the board is unable to resolve the disagreement within ten (10) days of receipt of the notice of disagreement, the board shall immediately arrange for an evaluation of the employee by an independent medical examiner. The independent medical examiner shall be selected by mutual agreement of the parties or, if the parties are unable to agree, appointed by the board under IC 22–3–4–11. *If the independent medical examiner determines that the employee is no longer temporarily disabled* or is still temporarily disabled but can return to employment that the employer has made available to the employee, or if the employee fails or refuses to appear for examination by the independent medical examiner, *temporary total disability benefits may be terminated.*

(d) *An employer is not required to continue the payment of temporary total disability benefits for more than fourteen (14) days after the employer's proposed termination date* unless the independent medical examiner determines that the employee is temporarily disabled and unable to return to any employment that the employer has made available to the employee.

(e) If it is determined that as a result of this section temporary total disability benefits were overpaid, the overpayment shall be deducted from any benefits due the employee under section 10 of this chapter.

USS paid Triplett TTD from September 20, 2001, through February 6, 2003. On February 6, 2003, Triplett reached maximum medical improvement, and USS closed her case. Thereafter, Triplett requested a Board-ordered IME. As a result, USS paid Triplett TTD from February 23, 2003, to March 8, 2003, totaling $1,096.00. Dr. George performed the IME and found that Triplett was at MMI and could return to work with restrictions. USS contends that the TTD payments it made from February 23, 2003 to March 8, 2003, constitute an overpayment for which it is entitled to a credit pursuant to Indiana Code Section 22–3–3–7(c) and -(e). We disagree.

Indiana Code Section 22–3–3–7(c) permits an employer to terminate TTD without notice to an employee in certain instances (for example, death or reemployment), but in all other cases, including when an injury has stabilized to a permanent and quiescent state, as in this case, the employer must notify the employee in writing of the employer's intent to terminate TTD on a form approved by the board. *Cavazos,* 783 N.E.2d at 1242; *Woehnker v. Cooper Tire & Rubber Co.,* 764 N.E.2d 688, 690 (Ind.Ct.App.2002). USS is silent as to whether it provided notice to Triplett necessary to terminate her benefits as of February 6, 2003. We

will not presume it did so. Therefore, we cannot conclude that Triplett's benefits terminated on February 6, 2003, as USS would have us do.

Moreover, even if USS had provided the required notice to terminate her benefits on February 6, 2003, we are not persuaded that Section 22–3–3–7(d) entitles USS to a credit. Section 22–3–3–7(d) merely provides that USS is not required to pay TTD more than two weeks after the employer's proposed termination date. USS has not explained how subsection (d) can be construed as creating a per se two-week overpayment. Accordingly, USS is not entitled to a credit.

Affirmed.

KIRSCH, J., and VAIDIK, J., concur.